Jason Joeseth POWELL *v.* Davelynn Felkel LANE
and Wendell Ray Lane

08-282                                                289 S.W.3d 440

Supreme Court of Arkansas
Opinion delivered December 11, 2008

*Mary M. Rawlins*, for appellant.

*Bob Keeter*, for appellees.

J IM HANNAH, Chief Justice. This is an appeal of an adoption decree granted to the appellees, Wendell Ray Lane and Davelynn Felkel Lane, permitting Wendell to adopt Davelynn's minor son, D.P., whom she conceived with appellant Jason Powell. The court of appeals reversed and remanded to the circuit court in a 5-4 decision. *See Powell v. Lane*, 101 Ark. App. 295, 275 S.W.3d 666 (2008). The Lanes petitioned this court for review, which we granted pursuant to Arkansas Supreme Court Rule 2-4 (2008). Because this appeal is before us on a petition for review, our jurisdiction of the case is pursuant to Arkansas Supreme Court Rule 1-2(e) (2008). Upon the grant of a petition for review, we consider the case as though it had been originally filed in this court. *See, e.g., Tucker v. Office of Child Support Enforcement*, 368 Ark. 481, 247 S.W.3d 485 (2007). We affirm the circuit court's order granting the petition for adoption, and we reverse the court of appeals.

It is undisputed that on December 31, 1996, Davelynn and Jason went to the First Baptist Church in Pencil Bluff where they were married by Reverend Bruce Tidwell. The ceremony was traditional in that Jason stood at the head of the church and Davelynn walked down the aisle in a creme-colored dress. When Davelynn reached the front of the church, she and Jason exchanged marriage vows while family and friends witnessed the ceremony. Davelynn's mother was among those present. Dave-

lynn was pregnant with Jason's child at the time of the ceremony and later gave birth to a son, D.P., on July 9, 1997. She and Jason lived together as husband and wife, from the date of the ceremony until their separation in the spring of 2004, almost eight years later.

It is also undisputed that Davelynn and Powell obtained a marriage license before the ceremony. The marriage license was not signed by Reverend Tidwell and was never returned to the county clerk for filing. Davelynn and Jason have never obtained a divorce.

On June 9, 2004, Davelynn petitioned the Montgomery County Circuit Court to establish paternity of her son, D.P. Davelynn alleged that Jason was the natural father of D.P., a minor child who was born out of wedlock to her on July 9, 1997. In addition, she averred that she and Jason were not married to each other or any other persons at the time of the conception and birth of D.P. The petition and summons were served on Jason, but he failed to answer and a default judgment was entered on July 23, 2004. In the order, the circuit court found that Jason was the natural father of D.P., and that Davelynn and Jason were not married to each other or any other persons at the time of the conception and birth of D.P. The order set a visitation schedule, required Jason to pay child support in the amount of seventy-five dollars per week, and required Jason to pay one-half of D.P.'s medical expenses. Jason did not appeal the default order. Subsequently, Jason moved to set aside the default judgment, but that motion was denied.

Davelynn and Wendell were married on September 4, 2004. On March 28, 2006, they petitioned the Polk County Circuit Court for a decree allowing Wendell to adopt D.P. without the consent of Jason. Davelynn consented to the adoption and alleged that Jason had failed significantly without justifiable cause to communicate with or support D.P. for at least one year. Jason answered, denying the allegations and refusing to consent to the adoption.

On May 12, 2006, Jason filed a petition for divorce against Davelynn in Montgomery County Circuit Court in the same cause of action as the paternity action. Davelynn moved to dismiss the petition, asserting that the issue of the validity of the marriage had already been resolved. The cases were consolidated in the Polk County Circuit Court and heard on July 5, 2006.

At the hearing, Davelynn testified that she was pregnant at the time of the wedding. She stated that she and Jason were not

married; rather, she testified that they "went through a ceremony." Davelynn added: "You do lots of things of play acting that's not legal and it's my understanding that that wasn't legal." She claimed that, at the time, Jason did not want to be married because he felt "trapped," but that they had already gotten the marriage license, her grandfather was dying, and she was an overwhelmed pregnant teenager who did not know what to do. Davelynn testified that she and Jason never intended to file the license and that the preacher never saw the marriage license. In addition, Davelynn stated that she "made a very bad decision," and that she and Jason were never married.

Davelynn also provided testimony regarding her marriage to Wendell. She stated that they were married on September 4, 2004, in Branson, Missouri. She further stated that Jason had not paid child support since December 2004 and that he had not paid any portion of D.P.'s medical bills.

Jason testified that D.P. had been diagnosed with aseptic optic dysplasia with hypopanpituitarism. Jason stated that he was his son's "primary shot-giver" and "primary medication-giver" during the first eight years of his son's life. Jason admitted that he stopped paying support to Davelynn through the Child Support Clearinghouse, but he denied that he quit paying support, stating that, instead, he deposited payments into a fund that he was maintaining for D.P. Jason said that he stopped paying money to the clearinghouse because he knew that doing so would cause the Child Support Enforcement Office to bring him into court. Jason stated that he believed that once he was brought into court, he could resolve all of the other issues with Davelynn.

Jason's sister-in-law, Melissa Powell, testified that she witnessed the marriage ceremony in which Jason and Davelynn were married. She stated: "We had a wedding, they kissed, they went down the aisle, they said, I do. That's what I seen."

Wendell testified that he and Davelynn were married on September 4, 2004, and have one child together. He further testified that D.P. had resided with him and Davelynn since they were married. Wendell stated that he wanted to adopt D.P. because he loved him and because he felt like D.P. was his son. Wendell also testified that he and Davelynn had received no financial support for D.P. from Jason since their marriage.

The circuit court dismissed Jason's divorce petition. In doing so, the circuit court ruled that Davelynn and Jason were never married because they failed to have the preacher who

performed their marriage ceremony sign the marriage license and because they also failed to file the license with the county clerk.

The circuit court then granted the adoption petition of Davelynn and Wendell. In its order granting the petition, the circuit court found that Jason and Davelynn were not married at the time D.P. was conceived or at any time thereafter. The circuit court further concluded that, while there was much testimony and conflict over whether Jason had attempted to communicate with D.P., there was no dispute that, in excess of one year, Jason had failed significantly, without justifiable cause, to pay child support for D.P. Accordingly, the circuit court determined that Jason's consent to the adoption was not necessary. Jason filed a motion for reconsideration, which was denied by the circuit court. Jason appealed to the court of appeals, which reversed and remanded the circuit court. The court of appeals held that Davelynn and Jason were validly married and that the circuit court erred in finding otherwise. *See Powell*, 101 Ark. App. at 296, 275 S.W.3d at 667. Further, the court of appeals held: "In that the trial court's finding that [Jason] and Davelynn were never married was the determinating factor regarding the remaining issues, we reverse and remand all issues presented." *Id.*, 275 S.W.3d at 667. Davelynn and Wendell now petition for review.

*The Validity of the Marriage*

Jason first contends that the circuit court erred in concluding that he and Davelynn were not validly married. Davelynn claims that the issue of the validity of the marriage was decided in the circuit court's July 23, 2004 default order. She points out that Jason took no appeal from that order and that he did not raise the issue of the validity of the marriage until nearly two years after the entry of the order, in a petition for divorce. Accordingly, Davelynn contends that Jason's arguments regarding the validity of the marriage are barred by res judicata. For his part, Jason asserts that Davelynn's paternity complaint did not address the validity of the marriage and, therefore, the default order could not have resolved the issue.

Res judicata bars relitigation of a claim in a subsequent suit when five factors are present. These include: (1) the first suit resulted in a final judgment on the merits; (2) the first suit was based upon proper jurisdiction; (3) the first suit was fully contested in good faith; (4) both suits involve the same claim or cause of action; and (5) both suits involve the same parties or their privies.

*Moon v. Marquez*, 338 Ark. 636, 999 S.W.2d 678 (1999). Further-more, res judicata bars not only the relitigation of claims that were actually litigated in the first suit, but also those that could have been litigated. *Id.* The purpose of res judicata is to put an end to litigation by preventing a party who had one fair trial on a matter from relitigating the matter a second time. *Id.* This court has applied the doctrine of res judicata in the context of family law. *Id.*

■■ While Davelynn couches her argument in terms of res judicata, it appears that she is asserting that Jason's challenge to the validity of the marriage is barred by collateral estoppel, or issue preclusion. Collateral estoppel requires four elements before a determination is conclusive in a subsequent proceeding: (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment. *State Office of Child Support Enforcement v. Willis*, 347 Ark. 6, 59 S.W.3d 438 (2001). The party against whom collateral estoppel is asserted must have been a party to the earlier action and must have had a full and fair opportunity to litigate the issue in that first proceeding. *See id.* Unlike res judicata, which acts to bar issues that merely could have been litigated in the first action, collateral estoppel requires actual litigation in the first instance. *Id.*

The default judgment states that Jason was properly served,[1] and that Davelynn and Jason "were not married to each other or any other persons at the time of the conception and birth." The paternity petition asserted that Jason and Davelynn "were not married to each other or any other persons at the time of the conception and birth" of D.P. Thus, Jason was on notice that the issue of the validity of this marriage was to be decided, and he had a full and fair opportunity to be heard. He chose not to be heard.

However, the dissent states that collateral estoppel does not apply to default judgments. In Arkansas, a default judgment is just as binding and enforceable as a judgment on the merits. *See State v. $258,035 U.S. Currency*, 352 Ark. 117, 98 S.W.3d 818 (2003). Nonetheless, the dissent asserts that collateral estoppel does not apply to default judgments because a default does not actually litigate the issues. The dissent errs in its definition of "actually

---

[1] The record shows that Jason was personally served.

litigated."[2] In the context of collateral estoppel, "actually litigated" means that the issue was raised in pleadings, or otherwise, that the defendant had a full and fair opportunity to be heard, and that a decision was rendered on the issue. For example, in *Bradley Ventures v. Farm Bureau Mutual Insurance Co. of Arkansas*, 371 Ark. 229, 237, 264 S.W.3d 485, 492 (2007), taking the guilty plea decided guilt to a charge of reckless burning, but taking the guilty plea did not decide the issue of Bradley's intent to commit arson with which he was originally charged. While this case does not concern a default judgment, it is similar in that it involved a plea that resolved the case without a full trial. To the argument of collateral estoppel, this court stated:

> The doctrine of collateral estoppel, or issue preclusion, bars the relitigation of issues of law or fact actually litigated by the parties in the first suit, provided that the party against whom the earlier decision is being asserted had a full and fair opportunity to litigate the issue in question and that issue was essential to the judgment.

*Bradley*, 371 Ark. at 234-35, 264 S.W.3d at 490. A guilty plea or a default judgment may satisfy the requirement of collateral estoppel where the issue was essential to the judgment and was properly raised and decided by the action. Both a guilty plea and a default judgment may provide a full and fair opportunity to heard, as in the present case. Jason chose not to avail himself of the opportunity to be heard. A default judgment determines the parties' rights just as any conventional judgment or decree. *See Meisch v. Brady*, 270 Ark. 652, 606 S.W.2d 112 (1980).

However, as the dissent notes, some courts in foreign jurisdictions hold that default judgments are not subject to collateral estoppel because default judgments do not arise from actual

---

[2] It appears that the confusion over the meaning of "actually litigated" may arise from the distinction between claim preclusion under res judicata and issue preclusion, or collateral estoppel. Under claim preclusion or res judicata, the entire claim is precluded, including any and all issues that were or might have been raised; however, under issue preclusion, or collateral estoppel, only those issues that were directly and necessarily adjudicated (actually litigated) are precluded. *See Mason v. State*, 361 Ark. 357, 206 S.W.3d 869 (2005). From this distinction comes the requirement under collateral estoppel that the issue to be precluded must have been "actually litigated." Thus, "actually litigated" has nothing to do with whether the judgment was obtained by default, summary adjudication, trial, or otherwise; rather, the question is whether the issue to be precluded was adjudicated in the judgment at issue.

litigation. *But see, e.g., Gottlieb v. Kest*, 46 Cal. Rptr. 3d 7, 34 (Cal. Ct. App. 2006) ("California, on the other hand, accords collateral estoppel effect to default judgments, at least where the judgment contains an express finding on the allegations.").[3] The courts holding that collateral estoppel does not apply to default judgments also err, as the dissent does, in the definition of "actually litigated." The citation of an Iowa case serves as an example of how the error arises. In *Blea v. Sandoval*, 761 P.2d 432, 435 (N.M. Ct. App. 1988), cited by the dissent, the New Mexico Supreme Court relied, among other cases, on *Lynch v. Lynch*, 94 N.W.2d 105 (Iowa 1959), for the proposition that a default judgment has no collateral estoppel effect. In *Lynch*, the Iowa Supreme Court stated, "Collateral estoppel is *usually* not available in default cases." 94 N.W.2d at 108 (emphasis added). This appears to support the dissent's position; however, upon further analysis, it is clear that *Lynch* does not hold that all default judgments fail to satisfy the requirements of collateral estoppel. In making the statement about collateral estoppel not usually applying to default judgments, the Iowa Supreme Court cited to *Matson v. Poncin*, 132 N.W. 970 (Iowa 1911). *Matson* does not state that collateral estoppel does not apply to default judgments. Rather, there we find that "it must appear that the particular matter was considered and passed on in the former suit, or the adjudication will not operate as a bar to subsequent action." *Matson*, 132 N.W. at 972. The court in *Matson*

---

[3] As the dissent notes in citing *In re Cantrell*, 329 F.3d 1119 (9th Cir. 2003), California does not follow the courts that hold there is a blanket rule against applying collateral estoppel to default judgments. This dates back some time as the authority cited by the court in *Cantrell* indicates. "The fact that the judgment was secured by default does not warrant the application of a special rule. 'A default judgment is an estoppel as to all issues necessarily litigated therein and determined thereby exactly like any other judgment.' " *In re Harmon*, 250 F.3d 1240, 1246 (2001) (quoting *Horton v. Horton*, 116 P.2d 605, 608 (Cal. 1941)). The complete quote, which is found in *Harvey v. Griffiths*, 23 P.2d 532, 534 (Cal. Ct. App. 1933), is as follows:

> It is immaterial that the judgment which is assailed was procured by default. The defendants in that action had an opportunity to appear and protect their interest. They deliberately waived the right to their day in court by failing to appear and answer the complaint. A default judgment is an estoppel as to all issues necessarily litigated therein and determined thereby exactly like any other judgment provided the court acquired jurisdiction of the parties and subject-matter involved in the suit.

*Harvey*, 23 P.2d at 534 (citing 3 A.C. Freeman, *A Treatise of the Law of Judgments* § 1296, at 2690 (5th ed. 1925)).

went on to state that "a matter, not embraced in the pleadings, and which was not necessarily determined in entering judgment could not have been directly in issue." *Id.* Thus, the phrase "collateral estoppel is usually not available in default cases," really meant that collateral estoppel is not available unless the matter was raised in the pleadings, or otherwise, and directly decided. Default judgments may or may not satisfy the requirements of collateral estoppel. The question must be considered on a case-by-case basis.

The issue of collateral estoppel and default judgments was also discussed in *Lane v. Farmers Union Insurance*, 989 P.2d 309 (Mont. 1999) (also cited by the dissent). There, the court considered the question of whether a default judgment served as a final judgment on the merits. To decide this, the court concluded it had to determine whether the issue was actually litigated and stated a test:

> This analysis requires two things: first, that the issue was effectively raised in the pleadings, or through development of the evidence, and argument at trial or on motion; and, second, that the losing party had a full and fair opportunity procedurally, substantively, and evidentially to contest the issue in a prior proceeding.

*Lane*, 989 P.2d at 317. Again, as in *Lynch*, *supra*, the question is whether the issue was properly raised and whether there was a full and fair opportunity to be heard.

Other courts have held that the requirement of actual litigation was met in a default judgment:

> A judgment taken by default is conclusive by way of estoppel in respect to all such matters and facts as are well pleaded and properly raised, and material to the case made by declaration or other pleadings, and such issues cannot be relitigated in any subsequent action between the parties and their privies.[4]

*In re Bursack*, 65 F.3d 51, 54 (6th Cir. 1995) (quoting *Lawhorn v. Wellford*, 168 S.W.2d 790, 792 (Tenn. 1943)). Still other jurisdictions

---

[4] This language appears to have originated in 1 Henry Campbell Black, *A Treatise on the Law of Judgments* § 87, at 126-27 (1891), where the above-quoted language is found. Black goes on to state that "while a default judgment is conclusive of all that is properly alleged in the complaint, it is conclusive of nothing more, and as a general rule it binds the defendant only in the character in which he is sued." *Id.*

bear out this conclusion that "actually litigated" means notice and a full and fair opportunity to be heard rather than litigation where a matter is decided only after development and introduction of evidence by both sides. A discussion in *Overseas Motors, Inc. v. Import Motors, Ltd.*, 375 F. Supp. 499 (D.C. Mich. 1974), is helpful:

> Default Judgment – Collateral estoppel applies only to those issues which were 'actually' or 'fully litigated' in the prior action. However, this rule does not refer to the quality or quantity of argument or evidence addressed to an issue. It requires only two things: first, that the issue has been effectively raised in the prior action, either in the pleadings or through development of the evidence and argument at trial or on motion; and second, that the losing party has had 'a fair opportunity procedurally, substantively, and evidentially' to contest the issue. The general rule therefore is that subject to these restrictions default judgments do constitute res judicata for purposes of both claim preclusion and issue preclusion (collateral estoppel).

*Overseas Motors, Inc.*, 375 Supp. at 516, *quoted in In re Bush*, 62 F.3d 1319, 1323 (11th Cir. 1995); *In re Houston*, 305 B.R. 111, 118 (Bankr. M.D. Fla. 2003); *In re Foster*, 280 B.R. 193, 205 (Bankr. S.D. Ohio 2002).

In the present case, the issue of the validity of the marriage was decided in the default judgment after personal notice and a full and fair opportunity to be heard. The determination of Davelynn's marital status was essential to the judgment in the paternity action. Davelynn asserted in the paternity action that she was not married at the time of D.P.'s conception and birth. Jason did not offer any evidence to the contrary, although he had the opportunity to do so. The circuit court declared that Davelynn was not married to Jason at the time of D.P.'s conception and birth. Thus, the issue of marital status was "actually litigated." The decision of paternity was conclusive, and Jason is bound by that decision. Collateral estoppel applies in this case. To hold otherwise would undermine the finality of judgments. There is no bright-line rule. Each judgment, taken by default, or otherwise, must be examined to determine what was finally decided and whether it meets the requirements of collateral estoppel.

In connection with his argument that his marriage to Davelynn was valid, Jason asserts that the adoption should be void because no home study was conducted of Davelynn and Wendell's home. Arkansas Code Annotated section 9-9-212(b)(1)(A) (Supp.

2005) states: "Before placement of the child in the home of the petitioner, a home study shall be conducted by any child welfare agency licensed under the Child Welfare Agency Licensing Act, § 9-28-401 et seq., or any licensed certified social worker." Pursuant to Arkansas Code Annotated section 9-9-212(c), "[t]he court may also waive the requirement for a home study when a stepparent is the petitioner." Jason asserts that because he and Davelynn never obtained a divorce, Davelynn's marriage to Wendell is void; therefore, Wendell is not D.P.'s stepparent, and a home study could not be waived.

■ There is a longstanding presumption against deliberate bigamy, *Bruno v. Bruno*, 221 Ark. 759, 256 S.W.2d 341 (1953), and there is a common law presumption of the validity of the second marriage, *Cole v. Cole*, 249 Ark. 824, 462 S.W.2d 213 (1971). The burden of disproving the validity of a marriage is on the one attacking it. *Bruno, supra*. Here, the only argument advanced by Jason is that the second marriage is void because he and Davelynn were still validly married, an argument that he is collaterally estopped from asserting. Jason has failed to overcome the presumption of the validity of the marriage between Davelynn and Wendell. It follows that he has failed to prove that Wendell was not D.P.'s stepparent at the time of the adoption and that a home study was required in this case.

### Consent to Adoption

Jason contends that the circuit court erred in granting the petition for adoption because there was insufficient evidence that he had failed significantly without justifiable cause to communicate with D.P. and to support D.P. Adoption statutes are strictly construed, and a person who wishes to adopt a child must prove that consent is unnecessary by clear and convincing evidence. *In re Adoption of A.M.C.*, 368 Ark. 369, 246 S.W.3d 426 (2007). A circuit court's finding that consent is unnecessary because of a failure to support or communicate with the child will not be reversed unless clearly erroneous. *Id.*

Arkansas Code Annotated section 9-9-206(a)(2) (Supp. 2005) provides in relevant part:

> (a) Unless consent is not required under § 9-9-207, a petition to adopt a minor may be granted only if written consent to a particular adoption has been executed by:

(2) The father of the minor if the father was married to the mother at the time the minor was conceived or at any time thereafter . . . .

Arkansas Code Annotated section 9-9-207(a)(2) (Supp. 2005) provides:

(a) Consent to adoption is not required of:

(2) a parent of a child in the custody of another, if the parent for a period of at least one (1) year has failed significantly without justifiable cause (i) to communicate with the child or (ii) to provide for the care and support of the child as required by law or judicial decree[.]

The circuit court concluded that, while there was much testimony and conflict over whether Jason had attempted to communicate with D.P., there was no dispute that the last child support was paid in December 2004. Therefore, the circuit court found that consent was not necessary. The failure to pay child support, standing alone, justifies the finding that consent is unnecessary. At the July 5, 2006 hearing, Jason admitted that he had "quit paying child support to [Davelynn]." He claimed that he had child support "sitting over here in a fund." The record reveals that Jason's last payment of child support to the clearinghouse was recorded on December 6, 2004. There was no evidence that he had otherwise paid child support. Thus, it is clear that Jason failed to pay support in excess of one year. Failure to pay support without justifiable cause means a failure that is voluntary, willful, arbitrary, and without adequate excuse. *See In re Adoption of K.F.H. & K.F.H.*, 311 Ark. 416, 844 S.W.2d 343 (1993) (citing *Bemis v. Hare*, 19 Ark. App. 198, 718 S.W.2d 481 (1986); *Roberts v. Swim*, 268 Ark. 917, 597 S.W.2d 840 (Ark. App. 1980)). Jason voluntarily, willfully, arbitrarily, and without adequate excuse failed to pay child support in excess of one year. Jason's reason for not paying support — that it was an attempt to get Davelynn back into court — is not justifiable cause for failing to support his child. The circuit court did not err in finding that consent to the adoption was unnecessary because Jason failed to pay child support in excess of one year.

*Opportunity to Cure*

Jason contends that the circuit court erred in granting the adoption and terminating his parental rights under the provisions of Arkansas Code Annotated section 9-9-207 (Supp. 2005) be-

cause he was not given the opportunity to cure as provided by Arkansas Code Annotated section 9-9-220(c)(1) (Supp. 2005), which provides:

> In any addition to any other proceeding provided by law, the relationship of parent and child may be terminated by a court order issued under this subchapter on any ground provided by other law for termination of the relationship, or on the following grounds:
>
> (1) Abandonment.
>
> (A) A child support order shall provide notice to the non-custodial parent that failure to pay child support or to visit the child for at least one (1) year shall provide the custodial parent with the right to initiate proceedings to terminate the parental rights of the non-custodial parent.
>
> (B) If the notification clause required by subdivision (c)(1)(A) of this section is not in the child support order, the custodial parent, prior to termination of parental rights, shall notify the non-custodial parent that he or she intends to petition the court to terminate parental rights.
>
> (C)(i) The non-custodial parent shall have three (3) months from the filing of the petition to pay a substantial amount of past due payments owed and to establish a relationship with his or her child or children.
>
> (ii) Once the requirements under subdivision (c)(1)(C)(i) of this section are met, the custodial parent shall not be permitted to proceed with the adoption nor the termination of parental rights of the non-custodial parent.
>
> (iii) The court may terminate parental rights of the non-custodial parent upon a showing that:
>
> (a) Child support payments have not been made for one (1) year or the non-custodial parent has not visited the child in the preceding year and the non-custodial parent has not fulfilled the requirements of subdivision (c)(1)(C)(i) of this section; and
>
> (b) It would be in the best interest of the child to terminate the parental relationship.

The record reveals that Jason had the opportunity to "cure" his failure to pay child support, pursuant to section 9-9-220(c)(1)(C), but he chose not to do so. The petition in this case was filed on March 28, 2006. Under section 9-9-220(c)(1)(C), Jason had three months from that date, or until June 28, 2006, to pay a substantial amount of past due payments owed and to establish a relationship with his child. No payments were made. Although Jason contended, at the hearing on July 5, 2006, that he paid the funds into a separate account, he never deposited those funds into the registry of the court nor did he pay any of those funds to the mother. Even after receiving notice that an adoption petition was filed, he still refused to comply with the court order regarding child support. By his own actions, Jason did nothing to enforce any right he might have had to "cure" his failure to pay child support.

In sum, the circuit court found that Jason's consent was not necessary for the adoption and that it would be in D.P.'s best interest to grant the petition for adoption. We recognize that the circuit court did not conclude, as we do, that Jason is collaterally estopped from challenging the validity of the marriage. It is axiomatic that this court can affirm a circuit court if the right result is reached even if it is for a different reason. *See, e.g., Alphin v. Alphin*, 364 Ark. 332, 219 S.W.3d 160 (2005). We affirm the circuit court's granting of the petition for adoption.

Court of appeals reversed; circuit court affirmed.

BROWN and WILLS, JJ., dissent.

ELANA CUNNINGHAM WILLS, Justice, dissenting. Because I do not agree that the default judgment entered in the paternity action has preclusive effect under the doctrine of collateral estoppel, I respectfully dissent.

As the majority points out, one required element of collateral estoppel is that the issue sought to be precluded must have been "actually litigated." "The question of whether an issue has been previously litigated is interpreted very narrowly for purposes of collateral estoppel." *In re Estate of Goston v. Ford Motor Co.*, 320 Ark. 699, 705, 898 S.W.2d 471, 473 (1995) (citing *Smith v. Roane*, 284 Ark. 568, 683 S.W.2d 935 (1983)). This court recently held that "actually litigated" means "actually litigated." *Bradley Ventures v. Farm Bureau*, 371 Ark. 229, 237, 264 S.W.3d 485, 492 (2007)

(guilty plea in a criminal case is not equivalent to a criminal conviction that has been "actually litigated"). Similarly, in *State Office of Child Support Enforcement v. Willis*, 347 Ark. 6, 16, 59 S.W.3d 438, 445 (2001), we held that where the trial judge stated in a divorce decree that "the parties hereby have one (1) child," but neither party put paternity at issue and no adversary presentations of evidence on this point were made, the court's finding of paternity "was not the result of litigation." By stating that the matter must actually be litigated, we "emphasize[d] the necessity for trying the issue sought to be estopped." *Willis*, 347 Ark. at 16, 59 S.W.3d at 445. This court has never before held that a default judgment satisfies the "actually litigated" prong of the collateral estoppel doctrine. We have held default judgments conclusive for purposes of the related doctrine of res judicata, *see, e.g., Bruns Foods of Morrilton, Inc. v. Hawkins*, 328 Ark. 416, 944 S.W.2d 509 (1997); however, the doctrine of res judicata does not require that the matter have been "actually litigated."

There is some disagreement among the courts of our sister states on the question of the preclusive effect of default judgments for purposes of collateral estoppel. The "majority view" has been described as a finding that, with default judgments, nothing is "actually litigated." *Gottlieb v. Kest*, 46 Cal. Rptr. 3d 7 (Cal. Ct. App. 2006); *see also Lane v. Farmers Union Ins.*, 989 P.2d 309 (Mont. 1999) (acknowledging the "general rule" that a default judgement carries no collateral estoppel effect). The courts adhering to this view often cite the Restatement (Second) of Judgments to this effect. The case of *Blea v. Sandoval*, 761 P.2d 432, 435–36 (N.M. Ct. App. 1988), is illustrative:

> There is ample authority for the proposition that a default judgement has no collateral estoppel effect. *See* Restatement (Second) of Judgments § 27e, at 257 (1982); *Grip-Pak, Inc. v. Illinois Tool Works, Inc.*, 694 F.2d 466 (7th Cir. 1982), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2430, 77 L.Ed.2d 1317 (1983); *In re McMillan*, 579 F.2d 289 (3d Cir. 1978); *Lynch v. Lynch*, 250 Iowa 407, 94 N.W.2d 105 (1959). The Restatement formulation and the foregoing cases recognize that default judgments do have res judicata effect, but distinguish collateral estoppel from res judicata. The basis of the distinction is the doctrine that res judicata bars consideration, in a subsequent suit, of all matters that could properly have been raised in the prior case, while collateral estoppel bars consideration only of issues actually litigated and determined by a valid and final judgment . . . . The Restatement and the foregoing federal cases recognize

that in a default judgment, the issues are not actually litigated. The Restatement also states that the policy of preventing endless litigation does not apply as strongly in the collateral estoppel context as it does when parties are repeatedly attempting to relitigate the same cause of action. Hence, while it may be proper to accord res judicata effect to a default judgment, it is not appropriate to give such a judgment collateral estoppel effect.

Examples of cases adhering to the general rule are *Lee ex rel. Lee v. United States*, 124 F.3d 1291 (Fed. Cir. 1997); *In re McMillan*, 579 F.2d 289 (3d Cir. 1978); *State ex rel. Department of Economic Security v. Powers*, 908 P.2d 49 (Ariz. Ct. App. 1995); *Burns v. A Cash Construction Lien Bond*, 8 P.3d 795 (Mont. 2000); *Lane, supra*; *McNair v. McNair*, 856 A.2d 5 (N.H. 2004); *Slowinski v. Valley National Bank*, 624 A.2d 85 (N.J. Super. Ct. App. Div. 1993); *Chambers v. City of New York*, 764 N.Y.S.2d 708 (N.Y. App. Div. 2003); *Martin v. Poole*, 336 A.2d 363 (Pa. Super. Ct. 1975); *McGill v. Southwark Realty Co.*, 828 A.2d 430 (Pa. Cmmw. Ct. 2003); *State v. Bacote*, 503 S.E.2d 161 (S.C. 1998); *Horton v. Morrison*, 448 S.E.2d 629 (Va. 1994); *Christian v. Sizemore*, 407 S.E.2d 715 (W. Va. 1991); *see also* 50 C.J.S. *Judgment* § 797 ("Although a party against whom a default judgment is entered certainly had an opportunity to litigate, most courts have concluded that an opportunity to litigate should not be given the same effect as actual litigation, unless the application of the estoppel to some subsequent proceeding was forseeable when the default was entered."); Note, *Collateral Estoppel in Default Judgments: The Case for Abolition*, 70 Colum. L. Rev. 522 (1970).[1]

Some courts have carved out limited exceptions to the general rule, "where the party against whom collateral estoppel is sought to be invoked has appeared in the prior action or proceeding and has, by deliberate action, refused to defend or litigate the

---

[1] As indicated above, there are some states, including California and Tennessee, that adhere to a different minority rule. The majority cites the decisions of these states. *See, e.g., Gottlieb, supra; Lawhorn v. Wellford*, 168 S.W.2d 790 (Tenn. 1943). The two Iowa cases cited by the majority are distinguishable, however. *Lynch v. Lynch*, 94 N.W.2d 105 (Iowa 1959), which stated that collateral estoppel is usually not available in default cases, turned upon the application of res judicata rather than collateral estoppel, and the court refused to apply the doctrine of collateral estoppel. *Matson v. Poncin*, 132 N.W. 970 (Iowa 1911), did not involve a default judgment and the issue was whether the court in the previous suit had made a finding on the particular issue sought to be estopped. These Iowa rulings do not clearly depart from the general rule that a default judgment carries no collateral estoppel effect.

charge or allegation that is the subject of the preclusion request." *In re Abady*, 800 N.Y.S.2d 651 (N.Y. App. Div. 2005); *accord Treglia v. MacDonald*, 717 N.E.2d 249 (Mass. 1999) ("We can, for example, envision circumstances in which a litigant may so utilize our court system in pretrial procedures, but nonetheless be defaulted for some reason, that the principle and rationale behind collateral estoppel would apply.") (citing *In re Gober*, 100 F.2d 1195 (5th Cir. 1996) (default judgments issued as discovery sanctions); *In re Bush*, 62 F.3d 1319 (11th Cir. 1995) (fraud)); *see also In re Docteroff*, 133 F.3d 210 (3d Cir. 1997); *In re Bursack*, 65 F.3d 51 (6th Cir. 1995); *Int'l 800 Telecom Corp. v. Kramer*, 591 N.Y.S.2d 313 (N.Y. Super. Ct. 1992). We have no such circumstances here.[2]

Here, the trial court correctly ruled in its July 24, 2006 order that the default judgment "was not, and could not, resolve questions of marital status." The majority concludes that the issue was "actually litigated" because: (1) the petition for declaration of paternity included the bald and disingenuous assertion that the parties "were not married to each other . . . at the time of the conception and birth"; and (2) Jason had a full and fair opportunity to be heard on the issue of the validity of the marriage after he was served with the paternity suit, and chose not to avail himself of the opportunity. This recitation of facts does little more than *restate* the ordinary factors creating a default judgment, albeit one in which the defendant received actual notice. The doctrine of collateral estoppel is normally inapplicable to such judgments under the general rule. Instead, the majority's holding is akin to the position adopted by California, as described by the Ninth Circuit Court of Appeals in *In re Cantrell*, 329 F.3d 1119, 1124 (9th Cir. 2002):

> The mere fact that "judgment was secured by default does not warrant the application of a special rule." California law does, however, place two limitations on this general principle. The first is that collateral estoppel applies only if the defendant "has been personally served with summons or has actual knowledge of the existence of this litigation." Collateral estoppel, therefore, only

---

[2] Although our court of appeals has applied the doctrine of collateral estoppel in one case involving a default judgment, *Reyes v. Jackson*, 43 Ark. App. 142, 861 S.W.2d 554 (1993), it did so without the depth of analysis that the weight of authority or matters addressed above command. The application of collateral estoppel to a judgment by default should be not decreed so lightly, either by the court of appeals or by the majority in this case.

applies to a default judgment to the extent that the defendant has actual notice of the proceedings and a "full and fair opportunity to litigate."

(Internal citations omitted.)[3] *But see* Walter W. Heiser, *California's Confusing Collateral Estoppel (Issue Preclusion) Doctrine*, 35 San Diego L. Rev. 509, 556 (1998) (suggesting that if the California Supreme Court really adheres to the four-factor test of the second Restatement of Judgments, it "should disapprove of those decisions that have extended collateral estoppel to default judgments"). I do not agree that this court should adopt this minority position, especially without more analysis as to its desirability or particular applicability to the facts of this case.[4]

The majority opinion repeatedly relies on the fact that Jason had a "full and fair opportunity" to be heard on the existence or validity of his marriage. I disagree that compliance with this requirement satisfies the "actually litigated" prong of collateral estoppel under Arkansas law. The requirement of a "full and fair opportunity" to litigate "apparently developed as a due process safeguard around the time the mutuality requirement was dropped in *Parklane Hoisery Co. v. Shore*, 439 U.S. 322 (1979)." *Falk v. Falk*, 88 B.R. 957, 962 n.5 (Bankr. D. Minn. 1988). The requirement of mutuality of estoppel has been eliminated in most jurisdictions, including Arkansas. *Id.*; *see also Willis, supra*; Mary H. Moore, *Arkansas' Position Regarding Defensive Collateral Estoppel and the Mutuality Doctrine*, 47 Ark. L. Rev. 701 (1994). Strangers to the first decree may assert collateral estoppel as long as the person against whom it is asserted had a "full and fair opportunity to litigate." This is necessary to satisfy due process concerns. *See Parklane Hoisery, supra*. However, this requirement does not obviate the "actually litigated" prong of collateral estoppel in Arkansas. *See Willis, supra*.

As noted by the court in *Falk, supra*, 88 B.R. at 962, "[t]he demise of the mutuality doctrine and the development of the full and fair opportunity to litigate concept have lead [sic] to some

---

[3] The second factor that California requires is that there be an express finding on the point at issue.

[4] Even among the jurisdictions that apply the minority view, it does not appear that any jurisdiction has directly held that a default custody or paternity judgment, where the lack of a valid marriage is indicated, can preclude the parties from subsequently litigating the validity of the marriage under the collateral estoppel doctrine.

confusion with respect to the elements necessary to successfully assert collateral estoppel." The court explained as follows:

> Some courts use the traditional elements based on the Restatement of Judgments: (1) The issue sought to be precluded must be the same as that involved in the prior litigation; (2) That issue must have been actually litigated; (3) It must have been determined by a valid and final judgment; and (4) The determination must have been essential to the judgment. Other courts, however, apply somewhat different elements: (1) The issue was identical to one in a prior adjudication; (2) There was a final judgment on the merits; (3) The estopped party was a party or in privity with a party to the prior adjudication; and (4) The estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Falk*, 88 B.R. at 962 (citations omitted).[5]

We have not, until today, adopted the latter view. Instead, we have previously adhered to the traditional Restatement elements, including that the matter must have been "actually litigated." *See Bradley Ventures, supra*. After the demise of mutuality, the full and fair opportunity to litigate represents the bare minimum that must be afforded in light of due process concerns. I would not depart from our historical "actually litigated" test in this regard. As noted in the Restatement (Second) of Judgments § 27 cmt. e (1982), when approaching difficult questions regarding the "actually litigated" requirement, "policy considerations . . . weigh strongly in favor of nonpreclusion, and it is in the interest of predictability and simplicity for such a result to obtain uniformly," These interests are not fostered by a "case-by-case" approach favored by the majority.

The majority also relies upon the presumption of the validity of a second marriage and states that Jason "failed to overcome the presumption of the validity of the marriage between Davelynn and Wendell." The majority concludes that the "only argument advanced by Jason is that the second marriage is void because he and Davelynn were still validly married, an argument which he is collaterally estopped from asserting." As set out above, I disagree that the doctrine of collateral estoppel is applicable on these facts. In addition, the presumption of the legal validity of a second

---

[5] The latter view is the law of Montana. *See Lane, supra* (discussed by the majority).

marriage is just that, a presumption, which may be overcome with positive proof. *Watson v. Palmer*, 219 Ark. 178, 240 S.W.2d 875 (1951) (The "presumption is a rebuttable one, and may be overcome with sufficient proof . . . and must give way to reality when facts opposing the presumption are presented." (quoting *Gray v. Gray*, 199 Ark 152, 133 S.W.2d 874 (1939)). We have held that the presumption of the validity of the second marriage can be overcome with proof that the parties to the first ceremonial marriage never obtained a divorce. *See, e.g., Cole v. Cole*, 249 Ark. 824, 462 S.W.2d 213 (1971). The presumption is not as strong where there has not been a considerable lapse of time between the two marriages, *Bruno v. Bruno*, 221 Ark. 759, 256 S.W.2d 341 (1953). Here, it appears from the record that Davelynn and Wendell were married approximately two years after Davelynn's separation from Jason, and the trial court dismissed Jason's divorce petition in its July 24, 2006 order, even though it held that it was "clear that the parties did participate in a marriage ceremony."

No matter how lightly or irreverently Davelynn claims to have entered the union, the facts show that she procured, or participated in the procurement of: (1) a license; (2) a minister; (3) a "creme-colored" dress; and thereafter marched down the aisle in front of family and friends and said "I do." In my judgment, this is sufficient to meet the test for "solemnization" under Arkansas law and to overcome the presumed validity of the second marriage. The fact that the minister did not sign the license or return it is not fatal to the validity of the marriage, and the trial judge erred in so holding. *See Fryar v. Roberts*, 346 Ark. 432, 57 S.W.3d 727 (2001).[6] Because the potential adoptive parents in this instance could not have been validly married, I would reverse the trial court's grant of the adoption petition and remand for further proceedings. *Bruno*, 221 Ark. at 762, 256 S.W.2d at 343 (ceremonial marriage to a person who has previously been married and who never obtained a divorce is void). As the court of appeals noted, the trial judge's decision was based upon the erroneous conclusion that Davelynn and Jason were never validly married.

---

[6] Additionally, Davelynn and Jason lived together as husband and wife for over eight years after their ceremonial marriage and birth of their son. In *Allen v. Wallis*, 279 Ark. 149, 152, 650 S.W.2d 225, 227 (1983), this court stated that "[w]here there is cohabitation apparently matrimonial, a strong presumption of marriage arises which increases with the passage of time, during which the parties lived together as husband and wife, especially where the legitimacy of a child is concerned."

The doctrine of collateral estoppel should not be expanded, and the presumption of the validity of a second marriage given conclusive effect, in order to resolve a case in which the Arkansas law governing marriage is on one side, and the perceived equities are on the other. Accordingly, I respectfully dissent.

BROWN, J., joins this dissent.