2009 Ark. 276

Russ SKALLERUP and Beauford E. Myers Individually and o/b/o a class of similarly situated persons, Burchwood Bay Sewer Improvement District and Carpenter Dam–Catherine Heights Sewer Improvement District, Appellants,

v.

CITY OF HOT SPRINGS, Arkansas and Honorable Mike Bush, Mayor of Hot Springs, Arkansas, in his official capacity, Appellees.

No. 08–611.

Supreme Court of Arkansas.

May 14, 2009.

Arnold, Batson, Turner & Turner, PA, by: Todd Turner; and McMillan, McCorkle, Curry & Bennington, LLP, by: Toney McMillan, Arkadelphia, for appellant.

Brian W. Albright, City Attorney, Hot Springs, for appellee.

JIM HANNAH, Chief Justice.

Russ Skallerup and Beauford E. Myers, individually, and on behalf of a class of similarly situated persons; Burchwood Bay Sewer Improvement District; and Carpenter Dam–Catherine Heights Sewer District (collectively referred to as Skallerup) appeal from summary judgment entered in favor of the City of Hot Springs and Mike Bush in his official capacity as mayor (the City). Skallerup challenges the City's authority to charge nonresident City sewer customers a higher sewer rate and a higher debt-service charge than that charged to resident City customers.

This case comes before this court on a petition for review. *See Skallerup v. City of Hot Springs*, CA 07–1022, 2008 WL 1961473 (Ark.App. May 7, 2008). The court of appeals reversed the circuit court. This court granted a petition for review of the decision of the court of appeals, and our jurisdiction is pursuant to Arkansas Supreme Court Rule 1–2(e). When this court grants a petition for review of a court of appeals decision, we review the case as though it had originally been filed

with this court. *See Stehle v. Zimmereb-ner*, 375 Ark. 446, 291 S.W.3d 573 (2009).

At issue is the propriety of the entry of summary judgment. Summary judgment is granted when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *See Couch v. Farmers Ins. Co.*, 375 Ark. 255, 289 S.W.3d 909 (2008). Once the moving party has established a prima facie case showing that no genuine issue of material fact remains to be litigated, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review focuses not only on the pleadings, but also on the affidavits and documents filed by the parties. *Id.*

On March 27, 1970, the Arkansas Pollution Commission (Commission)[1] issued an order to the City of Hot Springs to cease polluting local waters, including Lake Hamilton and Lake Catherine. The City was further ordered to "take other remedial measures, including the construction of a comprehensive sewerage collection and treatment system ... adequate to serve the City of Hot Springs and its area of reasonable anticipated growth, and as may be necessary and appropriate to abate the pollution of said waters." Pursuant to a December 15, 1972 Commission order, "no additional private sewerage disposal systems" could be installed. As a conse-

quence of these orders, all further development in the subject areas stopped. According to the parties to this suit, these orders effectively constituted a ban on all construction and halted development in the Hot Springs area.

An agreement was reached with the Commission. It provided that a new City sewage treatment plant would be built. It was in the interest of the City and the nonresidents to cooperate in establishing a sewer system over the affected areas inside and outside the City so that development could be restarted. The nonresidents chose to avail themselves of the City sewage treatment plant rather than build and operate their own sewage treatment.

A number of improvement districts were created in areas largely outside the City. These districts designed, built, and paid for systems necessary to transport nonresident sewage to a point where it could be introduced into the City system. The districts have ceased to exist, and their systems, as of 1997, were dedicated to the City. The City has maintained the nonresident sewage transport systems to the present date.

By 2004, there was a need for an additional sewage treatment plant. Further, according to the City, it was operating the existing treatment facility at a deficit and was losing money at a rate that threatened the viability of the system. The City also noted that customers outside the city limits were typically farther away and created an "operating cost differential." Part of the cost differential apparently arises from the "hilly terrain" around Lake Hamilton that requires 110 "major pump stations" and 3500 "grinder pump stations." The City passed ordinance 5274 in 2004, which

---

1. This is now the Arkansas Pollution Control and Ecology Commission. *See* Ark.Code Ann. § 8-1-101 (Repl.2007).

imposed the new rates and debt-service charges. The increase in rates was 9% for City customers and 52% for non-City customers. Debt-service charges show a similar disparity.

■ Skallerup first argues that a 1994 consent order entered in *Burchwood Bay v. Ellis*, No. CV–93–1639 (Garland County Cir. Ct. Nov. 3, 1994), previously established Skallerup's right to enforce contracts between the improvement districts and the City, as well as rights to relief under estoppel. The only parties in the present case that were also parties in the *Burchwood* case are the Burchwood Bay Sewer Improvement District, the Carpenter Dam–Catherine Heights Sewer Improvement District, and the City of Hot Springs. The *Burchwood* case concerned Hot Springs City Resolution 2821 requiring that prior to any nonresident connecting to the City sewer system they had to be annexed to the city or agree to be annexed as soon as the subject land became contiguous to the City. The 1994 consent order concluded that the right to connect to the sewer system could not be made conditional on annexation. Sewer rates and debt-service charges were not at issue.

■■ Skallerup argues that under the doctrine of res judicata, the issue of equal treatment of residential and nonresidential customers of the City sewer system was decided by the circuit court in the *Burchwood* case and may not be decided again. The purpose of res judicata is to put to an end litigation by preventing a party who has already had a fair trial on the matter from litigating it again. *See Powell v. Lane*, 375 Ark. 178, 289 S.W.3d 440 (2008). Res judicata is comprised of two facets, claim preclusion and issue preclusion. *See Remmel Revocable Trust v. Regions Fin. Corp.*, 369 Ark. 392, 255 S.W.3d 453 (2007). Under claim preclusion, a valid and final judgment rendered on the merits by a court of competent jurisdiction bars another action. *See id.* Under issue preclusion, also referred to as collateral estoppel, only those issues that were actually adjudicated are precluded. *See Powell, supra.*

■ To prevail under claim preclusion, both suits must concern the same claim or cause of action. *See Council v. Glyneu*, 367 Ark. 397, 240 S.W.3d 600 (2006). The claim or cause of action in the *Burchwood* litigation was that annexation could not be used as a condition of connection to the City sewer system. The claim in the present case is that sewer rates and sewer debt-service charges may not be different for nonresidents than they are for residents. We also note that, contrary to Skallerup's assertion, the consent order does not conclude that nonresident customers must be treated just as resident customers in all situations. Thus, the claims or causes of action in the present case are not based on the same events or subject matter as the *Burchwood* litigation, and the present case is not barred by claim preclusion. *Beebe v. Fountain Lake Sch. Dist.*, 365 Ark. 536, 545, 231 S.W.3d 628, 635 (2006). The questions of whether sewer rates or debt-service charges were improper were not matters that were or could have been ripe for adjudication in the *Burchwood* litigation regarding annexation. *See id.*

■ To prevail under issue preclusion, the issue sought to be precluded must be the same issue as previously litigated. *See Powell, supra.* The issue in the *Burchwood* litigation was annexation. The issues in the present case concern sewer rates and debt-service charges. Further, as already noted, and contrary to Skallerup's assertion, the consent order does not conclude that nonresident customers must be treated just as resident customers in all

situations. Thus, the issues in the present case are not the same as in the *Burchwood* litigation, and the present case is not barred by issue preclusion.

█ Skallerup next argues that the City is estopped from enforcing ordinance 5274 imposing the new rates and debt-service charges. Skallerup argues that, in the course of the agreement reached with the Commission to end the building ban, the City promised nonresidents that they would "receive equal treatment as customers of the regional system." On the issue of estoppel, Skallerup cites us to *City of Russellville v. Hodges*, 330 Ark. 716, 719, 957 S.W.2d 690, 691–92 (1997), where this court set out the elements of estoppel:

> They are: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that the conduct be acted on or must act so that the party asserting the estoppel had a right to believe it was so intended; (3) the party asserting the estoppel must be ignorant of the facts; and (4) the party asserting the estoppel must rely on the other's conduct and be injured by that reliance.

Skallerup argues that had the class known at the time the system was set up in the 1970s and 1980s that the City would not abide by its promise that nonresidents would pay the same fees as residents, they would not have entered into the contracts with the City to create the system and dedicated their systems to the City. Skallerup argues that the class has detrimentally relied on the promise of equal treatment for more than thirty years. The City argues that demands on the system have significantly increased over thirty years, and that the City must build an entirely new sewage treatment facility. The City further argues that costs of service to nonresidents have increased be-

cause of the hilly terrain that has been developed since that time. The City provided sewage services to nonresidents at the same rate as residents throughout the years in which the sewage system created under the agreements of the 1970s and 1980s could provide service. The City must now build new facilities that were not contemplated in the 1970s and 1980s. Skallerup argues that the class should be able to receive the benefit of the new system based on its agreements with respect to the old system. We hold that the elements of estoppel are not met. Skallerup has not shown that the City agreed in the 1970s and 1980s contracts to provide services at the same rate in perpetuity no matter what new facilities might be needed to supply demand. The class received the benefit of the system at the same rate as the residents so long as that system could provide the needed services. There is no evidence of detrimental reliance or that the class is injured. Skallerup does not show that there is a genuine issue of material fact with respect to estoppel.

█ We note that Skallerup references promissory estoppel in his brief. To the extent that Skallerup argues that estoppel applies to the contract obligations asserted, he is in error. Promissory estoppel applies when the elements of a contract cannot be shown. *See Reynolds v. Texarkana Constr. Co.*, 237 Ark. 583, 374 S.W.2d 818 (1964). Skallerup argues that contracts exist in the present case making promissory estoppel inapplicable. We hold that there is no relief available under either equitable estoppel or promissory estoppel.

█ Skallerup also argues that the City may be bound by contract to charge certain rates for municipal services.[2] The

**2.** We note that the parties presented arguments on the various contracts, who the par-

City relies on *Delony v. Rucker*, 227 Ark. 869, 302 S.W.2d 287 (1957), for the proposition that it may charge disparate rates. *Delony* concerned the constitutionality of Act 7 of 1955 that provided, relevant to this case, that "[w]ater may be supplied to nonresident consumers at such rates as the Legislative Body of the municipality may deem just and reasonable, and said rates need not be the same as the rates charged residents of the municipality." 227 Ark. at 870, 302 S.W.2d at 290. Further, this court in *Delony* stated that "[t]he specific issue here is whether the Little Rock municipal waterworks may charge its nonresident consumers higher rates than those paid by residents of the city." 227 Ark. at 871, 302 S.W.2d at 289. This court held, "A city's first duty is to its own inhabitants, who ordinarily pay for the municipal plant, directly or indirectly, and should therefore have a preferred claim to the benefits resulting from public ownership." *Delony*, 227 Ark. at 872, 302 S.W.2d at 289. The court went on to state that, "[u]pon this reasoning it is held by the decided weight of authority that 'the municipality, in the absence of any legislative limitation, may make a discrimination as to rates based solely on the political boundaries of the municipality.' " *Id.* (quoting Recent Case, *Rate Discrimination in Sale of Water Service to Non–Residents*, 101 U. Pa. L.Rev. 140 (1952)). This court also noted that "an agreement fixing public utility rates to be charged in the future is subject to the sovereign's reserved power of rate regulation and must yield to the exercise of that power." *Id.* at 874, 302 S.W.2d at 290. In *Camden v. Arkansas Light & Power Co.*, 145 Ark. 205, 224 S.W. 444 (1920), this court stated as follows:

> [t]o alter or regulate rates charged, or to be charged, by public utilities, is an inherent attribute of the police power or sovereignty existing in the state, which may be exercised at any time for the purpose of establishing the just, equitable, and reasonable rates under such circumstances as may exist at the time. It is seemingly an attribute of sovereignty which cannot be contracted away, and in contemplation of which all contracts or agreements must be made.

145 Ark. at 210, 224 S.W. at 446. In fact, any contract with a regulating body "must be made in full recognition of and subject to the sovereign power as much as if such a reservation were written into the body of the contract." *Camden Gas. Corp. v. City of Camden*, 184 Ark. 34, 37, 41 S.W.2d 979, 980 (1931).[3] Further, the state has the power, even under statutes enacted after contracting, "to impose regulations which have the effect of changing the terms of contracts in regard to rates for public service." *Clear Creek Oil & Gas Co. v. Ft. Smith Spelter Co.*, 148 Ark. 260, 275, 230 S.W. 897, 902 (1921) (citing *Ark. Light*, *supra*). The following language from *Phillips v. Town of Oak Grove*, 333 Ark. 183, 189, 968 S.W.2d 600, 603 (1998), on police power is instructive:

> In *Springfield v. City of Little Rock*, 226 Ark. 462, 290 S.W.2d 620 (1956), we recognized the city's plenary duty to exercise its police power in the interest of the public health and safety of its

ties to the contracts were, and whether subsequent contracts modified or nullified earlier contracts. Because our holding that a municipality may not restrict its power and obligation to charge reasonable rates for municipal services, there is no need to distinguish between the contracts.

3. Even if a municipality could be bound to certain rates by contract, because the contracts at issue did not contain a provision fixing the period of the contract's duration, they would be terminable at will by either party. *Delony v. Rucker*, 227 Ark. 869, 874, 302 S.W.2d 287, 290 (1957).

inhabitants. *Id.* at 464–65, 290 S.W.2d at 622. The police power of the state is founded in public necessity and this necessity must exist in order to justify its exercise. *Id.* It is always justified when it can be said to be in the interest of the public health, public safety, public comfort, and when it is, private rights must yield to public security, under reasonable laws. *City of Little Rock v. Smith,* 204 Ark. 692, 695, 163 S.W.2d 705, 707 (1942) (quoting *Beaty v. Humphrey,* 195 Ark. 1008, 115 S.W.2d 559 (1938)). The State has authorized the municipalities to legislate under the police power in Ark.Code Ann. § 14–55–102 (1987). That section provides, "Municipal corporations shall have the power to make and publish bylaws and ordinances, not inconsistent with the laws of this state, which, as to them, shall seem necessary to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience of such corporations and the inhabitants thereof."

It is clear that a city may not contract away its power and obligation to charge reasonable rates for municipal services. There is no merit to Skallerup's claim that the City could be bound to rates set by contract.

Skallerup finally argues that the new rates and debt-service charges are unreasonable. *Mount Olive Water Association v. City of Fayetteville,* 313 Ark. 606, 856 S.W.2d 864 (1993), is cited by the City for the proposition that "there is no law that prevents a city from charging a higher rate to those customers who reside out-side the city limits, so long as the rate is reasonable." The City cites Arkansas Code Annotated section 14–234–111(d) (Repl.1998), which provides that sewer service may be extended to adjacent areas and that the municipality has the power to fix the rates.[4]

The City offered a rate study from NRS Consulting Engineers. Further, evidence was offered to show that because a second system was being constructed, higher rates should be charged because of "considerably greater costs associated with providing services to outside City customers." We also note evidence offered showing that due to the need for new facilities and due to higher costs associated with providing services in hilly terrain, the costs needed to be higher for nonresidents. Skallerup countered with conclusory testimony that the rates should not be higher. It was also argued that the rates for nonresidents were "drastically higher," but nothing beyond conclusory allegations were offered to counter the City's evidence that higher rates and debt-service charges were required. Skallerup argues that the nonresidents paid for their own system in the 1970s and 1980s, but that does not address the City's allegation that a second system must be built to provide capacity that was not required when the first system was constructed. The City put on proof that higher rates and charges were needed and reasonable. Skallerup has failed to meet proof with proof as required. *Couch, supra.*[5]

Below, Skallerup argued that the disparate rates and charges violates due

---

**4.** The City also cites us to Arkansas Code Annotated section 14–234–110(a)(3) (Repl. 1998) for the proposition that water may be supplied to nonresident consumers at different rates than those charged to resident consumers. However, sewer service rather than water service is at issue, so the statute is inapplicable.

**5.** Skallerup offered the deposition testimony of Donald Brady and E.J. "Pat" Patterson. The City argues the deposition testimony must be excluded as untimely. We agree.

process, equal protection, and constitute an illegal tax. Those arguments were not developed on appeal and will not be addressed. *See Teris, L.L.C. v. Chandler*, 375 Ark. 70, 289 S.W.3d 63 (2008). Affirmed.