# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1659

_____

Patricia Dodson,                              *
                                              *
         Plaintiff - Appellant,       *
                                              *  Appeal from the United States
    v.                           *  District Court for the
                                              *  Eastern District of Arkansas.
University of Arkansas for Medical            *
Sciences, by and through the                  *  [PUBLISHED]
University of Arkansas System Board           *
of Trustees; James E. Lindsey, Trustee,       *
in his official capacity only; Tim E.         *
Hunt, Trustee, in his official capacity       *
only; Jane Rogers, Trustee, in her            *
official capacity only; Carl Johnson,         *
Trustee, in his official capacity only;       *
John Ed Anthony, Trustee, in his              *
official capacity only; Mike Akin,            *
Trustee, in his official capacity only;       *
Sam Hilburn, Trustee, in his official         *
capacity only; Jim Von Gremp, Trustee,        *
 in his official capacity only; John       *
Tyson, Trustee, in his official capacity      *
only; Ben Hyneman, Trustee, in his            *
official capacity only; B. Alan Sugg,         *
President of the University of Arkansas       *
System, in his official capacity only;        *
I. Dodd Wilson, M.D., Chancellor,             *
University of Arkansas for Medical            *

Sciences, in his official and individual    \*
capacity; Jackson O. Lay,    \*
   \*

      Defendants - Appellees.    \*

_____

Submitted: December 18, 2009
Filed: April 2, 2010

_____

Before RILEY, Chief Judge,[1] WOLLMAN, and MELLOY, Circuit Judges.

_____

PER CURIAM.

Appellant Patricia Dodson seeks control over the fate of eighteen cryogenically frozen embryos, which she created with her ex-husband through the In-Vitro Fertilization ("IVF") Program at the University of Arkansas for Medical Sciences ("UAMS"). Dodson brought this action, alleging that UAMS's refusal to allow her control over the disposition of the embryos violates her constitutional rights and breaches an implied contract. The district court[2] dismissed the complaint because subject matter jurisdiction was lacking pursuant to the Rooker-Feldman doctrine. We affirm.

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

[2]The Honorable James M. Moody, United States District Judge for the Eastern District of Missouri.

## I.     Background

In 1995, Patricia Dodson (formerly Patricia Lay) and her then-husband, Dr. Jackson Lay, participated in the IVF Program at UAMS with the goal of creating an embryo to be implanted into Dodson.  When they enrolled in the IVF Program, Dodson and Lay signed a two-page document called a "Control and Disposition of Embryos Statement" ("the Disposition Statement").  The Disposition Statement governed the IVF Program's responsibility for custody of Dodson's ova, Lay's sperm, and any resulting embryos.  Moreover, UAMS acknowledged that Dodson and Lay would control and direct the disposition of the tissues.  At any time prior to implantation in Dodson's uterus, the couple or the surviving single spouse could direct that the tissues be destroyed, used for medical research, or transferred to the custody of another physician or health-care facility.  Finally, in the Disposition Statement, Dodson and Lay agreed that in the event of dissolution of their marriage by court order, "all control and direction of [their] tissues will be relinquished to the medical director" of the IVF Program ("the IVF Program Director").  Through the IVF Program, the couple produced eighteen embryos, which were cryogenically frozen and stored at UAMS.

Dodson and Lay divorced in 1997.  The Chancery Court of Hot Springs County, Arkansas entered a divorce decree, which incorporated a property settlement agreement.  In paragraph seven of the property settlement agreement, Dodson and Lay acknowledged and reaffirmed the terms of the Disposition Statement.  Furthermore, they agreed that Dodson "shall have the right to choose from available options, if any, for disposition as listed in the [Disposition Statement]."

In 1999, Dodson asked UAMS to implant the embryos into her.  However, UAMS would not comply with her request unless she obtained explicit written consent from Lay.  Lay authorized UAMS to either destroy the embryos, use the embryos for medical research, or allow the embryos to be legally adopted by another

married couple in connection with the IVF Program. Lay consented to Dodson choosing among those three options, but he refused consent for implantation into Dodson. In response, Dodson requested the Hot Springs County Chancery Court to order that Lay, through the divorce decree, had consented to whatever procedure Dodson negotiated with UAMS, including implantation into herself. Jackson O. Lay v. Patricia Dodson, No. E-96-287 (Nov. 10, 1999) ("Dodson I"). The court denied relief, finding that Lay only consented to those options listed in the Disposition Statement. Next, the chancery court found under the terms of the Disposition Statement, all control and direction of the tissues was relinquished to the IVF Program Director upon the dissolution of the marriage by court order. UAMS was not a party in Dodson I, and the chancery court noted that it "was not called upon to interpret the third party contract."

Subsequently, the IVF Program Director allowed Dodson twenty-one days to elect one of the three options available under the Disposition Statement: destruction, medical research, or transfer/adoption by another couple. In January 2000, Dodson sued UAMS, the UAMS Chancellor, and the IVF Program Director in the Chancery Court for Pulaski County, Arkansas. Patricia Dodson v. UAMS et al., No. IJ 2000-0307 (Feb. 15, 2000) ("Dodson II"). Dodson later substituted the UAMS Board of Trustees for the Chancellor and Director. According to the chancery court's opinion, Dodson sought the following relief:

> [A] declaratory judgment that 1) her ex-husband consented or relinquished his right to consent or object to the implantation of certain embryos into [Dodson], 2) she fulfilled her obligation under the agreement with UAMS, and, 3) UAMS must fulfill its obligation to implant the embryos into her. Plaintiff also sought a temporary restraining order and preliminary injunction prohibiting UAMS from disposing of or injuring the embryos until a final hearing on the merits.

-4-

The defendants in <u>Dodson II</u> asserted state law sovereign immunity as a defense. Dodson argued that sovereign immunity did not apply because she sought to enjoin arbitrary, capricious, and *ultra vires* actions of state officials. The court dismissed Dodson's claim with prejudice. First, the court construed the complaint as requesting declaratory—not injunctive—relief, and therefore her claim was not cognizable. Second, the court held that, even if construed as a request for injunctive relief, Dodson's claim failed as a matter of law because UAMS's actions were "reasonable, sound, and within their authority." The court explained:

> Finally, considering the evidence in the light most favorable to [Dodson], the court cannot conclude that defendants' actions are arbitrary or ultra vires. To the contrary, [Dodson] and Dr. Lay authorized the medical director of the IVF Program to take control of the embryos in the event the couple divorced. The medical director has full authority to decide how to dispose of the embryos. He has been more than reasonable in allowing [Dodson] to choose which of the three previously agreed-upon options should be selected. It was reasonable for him to ask [Dodson] to get her ex-husband's consent to become the biological father to a child born to his ex-wife more than two years after they divorced.

Dodson appealed the chancery court's ruling. The Arkansas Supreme Court dismissed her appeal in December 2001 for failure to order a transcript of the chancery court proceedings.

Notwithstanding the court orders in <u>Dodson I</u> and <u>Dodson II</u>, UAMS continued to send bills to Dodson for embryo storage fees due to an apparent clerical mistake. In total, Dodson paid the storage fees on a monthly or quarterly basis for nearly eleven years after her divorce from Lay and for over six years after the Pulaski County Chancery Court found that she had no right to control the disposition of the embryos. Then, in February 2008, UAMS notified Dodson that it was closing the embryo cryopreservation program and that it would transfer the embryos to another facility. In March 2008, UAMS sent Dodson a consent form required for UAMS to ship the

-5-

frozen embryos elsewhere. Dodson requested UAMS allow her to decide the fate of the embryos. UAMS informed her that the IVF Program Director retained sole authority over the embryos and that UAMS was not bound to honor her requests.

In October 2008, Dodson filed this action in federal district court against UAMS through the Board of Trustees for the University of Arkansas System, the UAMS President, the UAMS Chancellor, the Trustees individually, and Lay.[3] In Count I, Dodson alleges a claim under 42 U.S.C. § 1983 for violations of her rights under the Fourth, Fifth, Ninth, and Fourteenth Amendments to the U.S. Constitution and Amendment Sixty-Eight to the Arkansas State Constitution. Count II is a state-law cause of action, alleging that UAMS breached an implied contract based upon Dodson's payment of storage fees for the embryos. Dodson requested injunctive relief to prevent UAMS from interfering with her right to control the "potential life" and the disposition of the embryos.[4] Simultaneously, Dodson moved for a temporary restraining order to prevent UAMS from jeopardizing the safety of the embryos. That request was denied as moot after UAMS agreed to maintain the embryos in their current condition pending the resolution of this litigation.

The defendants moved to dismiss the complaint pursuant to Rules 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction and pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Lay also sought dismissal because the requested relief would force him to become a biological father against his will, violating his alleged right to procreative autonomy. The district court granted the motions to dismiss for lack of subject matter jurisdiction under the Rooker-Feldman doctrine. In support, the district court found the complaint

---

[3]Dodson included Lay as a defendant in order to determine his "rights and responsibilities . . . based on his conduct and agreements previously entered."

[4]In this appeal, Dodson clarified that she hopes to donate the embryos for adoption.

"inextricably intertwined" with previous state-court proceedings because "[Dodson's] claims could succeed only upon a finding that the state courts wrongly decided the issues."

In this appeal, Dodson argues that the Rooker-Feldman doctrine is inapplicable because the Dodson II was decided on the basis of sovereign immunity, a jurisdictional bar under Arkansas law. In addition, Dodson contends that Rooker-Feldman is inapplicable because she does not seek to overturn a state court decision. Appellees maintain that dismissal under Rooker-Feldman was proper, and alternatively, that Dodson's claims are barred due to res judicata, collateral estoppel, the Eleventh Amendment, and failure to plead a right that can be vindicated under § 1983.

## II.    Subject Matter Jurisdiction

### A.    Law

"The 'basic theory' of the Rooker-Feldman doctrine is 'that only the United States Supreme Court has been given jurisdiction to review a state-court decision,' so federal district courts generally lack subject-matter jurisdiction over 'attempted appeals from a state-court judgment.'" Friends of Lake View Sch. Dist. No. 25 v. Beebe, 578 F.3d 753, 758 (8th Cir. 2009) (quoting 18B Charles Alan Wright et al., Federal Practice and Procedure § 4469.1, at 97, 101 (2d ed. 2002)). The doctrine is narrow. Id. The "doctrine 'is confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced.'" Id. (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)).

This court has expressly cautioned against a state court loser seeking victory against his adversary in a subsequent § 1983 action in federal court.

> Litigants can choose whether to pursue . . . claims in state or federal court. Charchenko v. City of Stillwater, 47 F.3d 981, 984 (8th Cir. 1995). Once a party has litigated in state court, however, he "cannot circumvent Rooker-Feldman by recasting his or her lawsuit as a [section] 1983 action." Bechtold v. City of Rosemount, 104 F.3d 1062, 1065 (8th Cir. 1997). In other words, if a litigant has raised and lost claims in state court, he may not recast those claims under section 1983 and try again. He must follow the appellate procedure through the state courts and seek review before the Supreme Court. See Rooker [v. Fid. Trust Co., 263 U.S. 413, 415-16 (1923)].

Prince v. Ark. Bd. Exam'rs in Psychol., 380 F.3d 337, 340 (8th Cir. 2004).

## B.    Count I

We affirm the dismissal of Count I because Dodson is a "state-court loser[] complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced." Friends of Lake View, 578 F.3d at 758. Although the precise context of the Hot Springs Chancery Court's ruling in Dodson I is unclear from the record before us, it is undisputed the Hot Springs Chancery Court specifically found as follows: "Under the terms of the [Disposition Statement], upon the dissolution of the marriage by court order, all control and direction of the tissues as of January 29, 1997, was relinquished to the [the IVF Program Director]." Any ruling in the case at bar in Dodson's favor, i.e., that the federal constitution demands the return of the embryos to Dodson, would wholly undermine this part of the Hot Springs Chancery Court's ruling in Dodson I.

In Dodson II, the Pulaski Chancery Court determined the IVF Program Director had the right to dispose of the embryos. Even if that determination were technically obiter dictum, it was not a stray remark on an issue not presented to it. Cf. Stemler v. Florence, 350 F.3d 578, 589 (6th Cir. 2003) (holding Rooker-Feldman did not preclude a federal lawsuit, where state court only discussed related claim, which was

"not an issue that was salient" to the state court, in <u>dicta</u>). This is not a case in which the state court simply held it lacked jurisdiction and dismissed the plaintiff's case without prejudice. Rather, the state court discussed the merits of Dodson's case extensively and dismissed <u>Dodson II</u> with prejudice.[5]

## C.  Count II

Nothing in the foregoing analysis applies to Count II. All of the *conduct* alleged in Count II occurred *after* <u>Dodson I</u> and <u>II</u> and, therefore, the <u>Rooker-Feldman</u> doctrine is inapplicable as to Count II. <u>See</u> <u>Exxon</u>, 544 U.S. at 284 (stressing the <u>Rooker-Feldman</u> doctrine is "confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"). Neither the Hot Springs Chancery Court nor the Pulaski Chancery Court considered Dodson's allegations that the defendants continued to bill her for storage of the embryos, accepted payment therefor, and made statements to her in which defendants indicated Dodson had the right to dispose of the embryos.

---

[5]It appears there is some tension in our prior precedents as to whether the <u>Rooker-Feldman</u> doctrine will bar a federal court from exercising jurisdiction when a state court previously ruled against the plaintiff without reaching the merits of the dispute. In <u>Friends of Lake View</u>, for example, this court stated "'the <u>Rooker-Feldman</u> doctrine does not bar federal claims brought in federal court when a state court previously presented with the same claims declined to reach their merits.'" <u>Friends of Lake View</u>, 578 F.3d at 758 (quoting <u>Simes v. Huckabee</u>, 354 F.3d 823, 830 (8th Cir. 2004)). In other cases, however, this court held "[a]pplication of the <u>Rooker-Feldman</u> doctrine does not depend on a final judgment on the merits of an issue." <u>Goetzman v. Agribank, FCB</u> (<u>In re Goetzman</u>), 91 F.3d 1173, 1178 (8th Cir. 1996)).

With Count I properly dismissed, there are no federal claims in this case and jurisdiction under 28 U.S.C. § 1331 abates. The Supreme Court has recognized that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). While "this rule is not inflexible," Grain Land Coop v. Kar Kim Farms, Inc., 199 F.3d 983, 993 (8th Cir. 1999), it is difficult to say the district court expended such a substantial amount of time and resources on Dodson's case to warrant retention of Count II in federal court. Cf. Murray v. Wal-Mart, Inc., 874 F.2d 555, 558 (8th Cir. 1989) (noting substantial investment of the district court's time and resources may justify continued exercise of supplementary jurisdiction). We remand for the dismissal of Count II without prejudice.

## III.  Conclusion

We affirm the district court's dismissal of Count I under the Rooker-Feldman doctrine. We remand for dismissal of Count II without prejudice.

MELLOY, Circuit Judge, concurring.

While I agree the dismissal of Count I should be affirmed, I believe the district court's reliance on Rooker-Feldman was misplaced because Dodson alleges injuries caused by UAMS—not injuries caused by a state-court judgment. I would affirm the district court judgment with regard to Count I under the state-law doctrines of res judicata and collateral estoppel. I concur in the majority's remand as to Count II.

## I.    Subject Matter Jurisdiction

It is well established that lower federal courts lack subject matter jurisdiction over straightforward appeals from a state-court judgment even though they may otherwise be empowered to adjudicate the dispute; such appellate jurisdiction rests solely with the U.S. Supreme Court.  D.C. Court of Appeals v. Feldman, 460 U.S. 462, 482 (1983) (holding that the federal district court lacked subject matter jurisdiction to review plaintiffs' complaint "to the extent [they] sought review . . . of the District of Columbia Court of Appeals' denial of their petitions"); Rooker v. Fid. Trust Co., 263 U.S. 413, 415 (1923) (affirming dismissal of federal suit to have state-court judgment "declared null and void").  Indirect appeals from state-court judgments have been more controversial, however.  In Feldman, the Supreme Court noted that federal district courts are prohibited from reviewing claims that are "inextricably intertwined" with a final state-court judgment.  460 U.S. at 482 n.16, 486.  Four years later, Justice Marshall elaborated:

> [T]he federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.  Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceeding as, in substance, anything other than a prohibited appeal of the state-court judgment.

Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 25 (1987) (Marshall, J., concurring).  Several lower federal courts relied on Justice Marshall's approach to expand Rooker-Feldman, holding that federal claims were barred because they were "inextricably intertwined" with state-court judgments.[6]  Indeed, Rooker-Feldman tripped up

---

[6]See Allison B. Jones, Note, The Rooker-Feldman Doctrine: What does it Mean to be Inextricably Intertwined?, 56 Duke L.J. 643, 665 (2006) ("With so little clear guidance from the Supreme Court concerning 'inextricably intertwined,' many lower courts have embraced this lucid definition from Justice Marshall."); Thomas D. Rowe

plaintiffs in our circuit even though they did not seek relief from a state-court judgment and their claims were not identical to claims asserted in state court. See, e.g., Prince v. Ark. Bd. Exam'rs in Psychol., 380 F.3d 337, 340 (8th Cir. 2004) (quoted ante at 7–8); Ace Const. v. City of St. Louis, 263 F.3d 831, 833 (8th Cir. 2001) (holding that the plaintiff's due process challenge to a city ordinance was barred because it was "inextricably intertwined" with a state-court ruling that plaintiff lacked standing to challenge the ordinance); Lemonds v. St. Louis County, 222 F.3d 488, 492–93, 495 (8th Cir. 2000) (explaining that Rooker-Feldman bars "indirect attempts by federal plaintiffs to undermine state court decisions"; quoting Justice Marshall's concurrence to affirm dismissal of plaintiff's "creative attempts to reclothe the failed due process claim in new constitutional garb.").

Then, in Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005), the Supreme Court clarified the "limited circumstances" in which Rooker-Feldman bars subject matter jurisdiction. Id. at 291. In its introductory remarks, the unanimous Court noted that the doctrine, which was "[v]ariously interpreted in the lower courts, . . . has sometimes been construed to extend far beyond the contours of the Rooker and Feldman cases." Id. at 283. The Court held that Rooker-Feldman "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Id. at 284. Applied to the complaint in Exxon, the Court held that Rooker-Feldman does not bar jurisdiction over an action brought by

Jr. & Edward L. Baskauskas, "Inextricably Intertwined" Explicable At Last? Rooker-Feldman Analysis After the Supreme Court's Exxon Mobil Decision, 2006 Fed. Cts. L. Rev. 1, 1 (2006) ("[T]he 'inextricably intertwined' formulation . . . had been a primary test for many lower courts."); Suzanna Sherry, Judicial Federalism in the Trenches: The Rooker-Feldman Doctrine in Action, 74 Notre Dame L. Rev. 1085, 1097 (1999) (referring to Justice Marshall's concurrence as the "most useful—and frequently quoted—definition of 'inextricably intertwined'").

a state-court defendant against the state-court plaintiff before the state court entered judgment.  Id. at 294.  If the state court were to decide the case while the federal lawsuit is pending, the Court explained, then preclusion law—not Rooker-Feldman—would govern the disposition of the federal action.  Id. at 293.  Subject matter jurisdiction is proper even if "a party attempts to litigate in federal court a matter previously litigated in state court."  Id.

Eleven months later, in Lance v. Dennis, 546 U.S. 459 (2006) (per curiam), the Court held that jurisdiction is not barred merely because the plaintiffs were in privity with a party to a prior state-court case.  The Court rejected the privity theory because it "erroneously conflate[s] preclusion law with Rooker-Feldman."  Id. at 466.  "Rooker-Feldman is not simply preclusion by another name."  Id.  Instead, Rooker-Feldman as a "narrow doctrine" that "applies only . . . where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court."  Id. at 464, 466.  "A more expansive Rooker-Feldman rule," which would incorporate preclusion principles, "risks turning that limited doctrine into a uniform *federal* rule governing the preclusive effect of state-court judgments, contrary to the Full Faith and Credit Act."  Id. at 466.

We have generally applied a narrower version of Rooker-Feldman since Exxon and Lance.  For example, in Skit International Ltd. v. DAC Technologies of Arkansas, Inc., 487 F.3d 1154 (8th Cir. 2007), we explained, albeit as dictum, "Rooker-Feldman is implicated in that subset of cases where the losing party in a state court action subsequently complains about that judgment and seeks review and rejection of it."  Id. at 1157.  In Riehm v. Engelking, 538 F.3d 952 (8th Cir. 2008), we held that Rooker-Feldman was inapplicable to a complaint that "alleges unconstitutional actions by [the defendant] in seeking and executing [an] ex parte order," rather than "challenging the state court's issuance of the ex parte order."  Id. at 965.  We quoted the Ninth Circuit, explaining:

If a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision, Rooker-Feldman bars subject matter jurisdiction in federal district court. If, on the other hand, a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, Rooker-Feldman does not bar jurisdiction.

Riehm, 538 F.3d at 965 (quoting Noel v. Hall, 341 F.3d 1148, 1164 (9th Cir. 2003)); see also Friends of Lake View Sch. Dist. Inc. No. 25 v. Beebe, 578 F.3d 753, 758–59 (8th Cir. 2009) (suggesting that the fact that the plaintiffs did "not claim to be aggrieved by the outcome of [prior state-court] litigation . . . would seem to foreclose the defendants' argument that the Rooker-Feldman doctrine applies"); MSK EyEs LTD v. Wells Fargo Bank, 546 F.3d 533, 539 (8th Cir. 2008) (distinguishing claims seeking review and rejection of a state-court judgment, which are barred, from claims that merely attack an adverse party's actions, which are permitted).[7]

Dodson's complaint is distinguishable from the complaints in our post-Exxon cases. Dodson's § 1983 claim can succeed only upon a finding that the Arkansas chancery courts wrongly decided that the IVF Program Director has authority to control the disposition of the embryos. See ante at 8. Since Exxon, we have not addressed an indirect appeal where a plaintiff's claim can succeed only to the extent that the federal court concludes that a state court wrongly decided a factual or legal issue. As such, this appeal squarely presents a lingering question in our Rooker-Feldman jurisprudence, which is whether the "inextricably intertwined" language has any independent significance.

---

[7]The exception is United States v. Timley, 443 F.3d 615 (8th Cir. 2006), in which we applied Justice Marshall's approach and held that the plaintiff's claims were not inextricably intertwined with a final state-court judgment. Id. at 628. Surely, then, Exxon's more limited formulation of Rooker-Feldman would have produced the same outcome.

In the majority of other circuits, the "inextricably intertwined" language in Feldman does not impose an independent substantive test for indirect appeals from state-court judgments. The Seventh and Ninth Circuits limited the "inextricably intertwined" test before Exxon. See Noel, 341 F.3d at 1158; GASH Assocs. v. Vill. of Rosemont, Ill., 995 F.2d 726, 728 (7th Cir. 1993), quoted in Exxon, 544 U.S. at 293. Following Exxon, several circuits have concluded that the Court abandoned the "inextricably intertwined" part of the doctrine. The Fourth Circuit explained:

> Under Exxon, then, Feldman's "inextricably intertwined" language does not create an additional legal test for determining when claims challenging a state-court decision are barred, but merely states a conclusion: if the state-court loser seeks redress in the federal district court for the injury caused by the state-court decision, his federal claim is, by definition, "inextricably intertwined" with the state-court decision, and is therefore outside of the jurisdiction of the federal district court.

Davani v. Va. Dep't of Transp., 434 F.3d 712, 719 (4th Cir. 2006); see also East Hill Synagogue v. City of Englewood, 240 F. App'x 938, 941 n.1 (3d Cir. 2007) (unpublished); McCormick v. Braverman, 451 F.3d 382, 394–95 (6th Cir. 2006); Bolden v. City of Topeka, 441 F.3d 1129, 1143 (10th Cir. 2006); States Res. Corp. v. Architectural Team, Inc., 433 F.3d 73, 79–80 (1st Cir. 2005); Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 86–87 (2d Cir. 2005).

In accordance with the view expressed by a majority of circuits, I would hold that Rooker-Feldman is limited "to the setting in which it arose." 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice & Procedure, § 4469.1 at 13 (2d ed., Supp. 2009). "If a federal plaintiff presents some independent claim, *albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party*, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." Exxon, 544 U.S. at 293 (internal alterations omitted, emphasis added) (quoting GASH Assocs., 995 F.2d

-15-

at 728); see also Lance, 546 U.S. at 466 (reiterating that lower courts should not incorporate preclusion principles into Rooker-Feldman). Rooker-Feldman does not bar jurisdiction merely because a federal claim is "inextricably intertwined" with a state-court judgment, i.e., because the federal claim is premised on a position that contradicts a state court's decision. Subject matter jurisdiction is improper, and thus the claims are inextricably intertwined, only for "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon, 544 U.S. at 284. To be sure, several courts implicitly disagree with this conclusion by continuing to apply the "more expansive Rooker-Feldman rule." Lance, 546 U.S. at 466.[8] However, I would decline to follow these cases because they either rely on pre-Exxon authority or fail to reconcile their holdings with the limiting language in Exxon and Lance.

The Court would hold that Rooker-Feldman applies to Count I because any ruling in Dodson's favor would "wholly undermine" state-court findings in Dodson I and Dodson II. Ante at 8. This conclusion, in substance, applies Justice Marshall's approach to Rooker-Feldman, albeit without using the "inextricably intertwined" language. I would hold that the district erred by dismissing the complaint as

---

[8]See, e.g., In re Madera, 586 F.3d 228, 232 (3d Cir. 2009) (holding that Rooker-Feldman barred a debtor's action to rescind a mortgage because it was "inextricably intertwined" with a state court's foreclosure judgment, which was premised on the existence of a valid mortgage); MAPP Const., LLC v. M&R Drywall, Inc., 294 F. App'x 89, 91 (5th Cir. 2008) (unpublished per curiam) (holding that Rooker-Feldman precludes jurisdiction over a federal lawsuit to compel arbitration under the Federal Arbitration Act because the action was "inextricably intertwined" with the plaintiff's failed state-law action to compel arbitration under the Louisiana Arbitration Act); Indus. Comm'n & Elec., Inc. v. Monroe County, 134 F. App'x 314, 317–19 (11th Cir. 2005) (unpublished per curiam) (affirming dismissal under Rooker-Feldman because each cause of action was "'inextricably intertwined' with parallel allegations contained in [the plaintiff's] former state court complaint").

"inextricably intertwined" with previous state-court judgments, thereby ignoring Exxon's limitation on Rooker-Feldman. Dodson does not request relief against a state-court judgment, and importantly, the complaint alleges that UAMS—not the Arkansas chancery courts—is the source of Dodson's injuries. Rooker-Feldman would apply only if Dodson were "complaining of injuries *caused by state-court judgments*." Exxon, 544 U.S. at 284 (emphasis added); see also Riehm, 538 F.3d at 964; Skit Int'l, 487 F.3d at 1157. Accordingly, I would hold that Rooker-Feldman does not bar the district court from exercising subject matter jurisdiction over Dodson's complaint. My analysis of Dodson's claims continues, however, because Appellees assert several other justifications for the district court judgment, and we may affirm on any basis supported in the record. Friends of Lake View, 578 F.3d at 758.

## II.    Preclusion

Appellees argue that Dodson I and II preclude Dodson's claims under the state-law doctrines of res judicata and collateral estoppel. Preclusion is a question of law, B & B Hardware, Inc. v. Hargis Indus., Inc., 569 F.3d 383, 387 (8th Cir. 2009), cert. denied, — S. Ct. —, 2010 WL 58424 (2010), and a potential basis for dismissal under Federal Rule of Civil Procedure 12(b)(6), Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs., 533 F.3d 634, 643–44 (8th Cir. 2008) (affirming dismissal based on res judicata). Arkansas law governs whether the preclusion doctrines apply here. Lance, 546 U.S. at 466. We must accept Dodson's factual allegations as true, and we may affirm the district court judgment "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

## A.    Res Judicata

Dodson I precludes Dodson's claims to the extent she has requested any relief against Lay.  The Hot Springs County Chancery Court adjudicated Lay's rights and responsibilities with regard to the embryos, and res judicata prohibits Dodson from relitigating those claims or pursuing other similar claims against Lay now.  See Cox v. Keahey, 133 S.W.3d 430, 435 (Ark. Ct. App. 2003) (res judicata bars a subsequent lawsuit "based on the same events as the subject matter of a previous lawsuit," even though the later lawsuit "raises new legal issues and seeks additional remedies.").

For UAMS, however, res judicata is unhelpful.  "Res judicata bars relitigation of a claim in a subsequent suit when [among other elements] . . . both suits involve the same parties or their privies."  Powell v. Lane, 289 S.W.3d 440, 444 (Ark. 2008). UAMS was neither a party to nor privy to Dodson I, and therefore the Dodson I does not preclude Dodson's claims against UAMS under the doctrine of res judicata.  The parties disagree about whether res judicata applies to Dodson II.  Dodson argues that the chancery court's dismissal pursuant to sovereign immunity was neither a final judgment on the merits nor based upon proper jurisdiction, which are both elements of res judicata under Arkansas law.  Id.  We need not reach these questions though, as Dodson's claims against UAMS are otherwise barred.

## B.    Collateral Estoppel

Under collateral estoppel, also known as issue preclusion, a state court's determination is conclusive in a subsequent proceeding if four elements are satisfied: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment."  Id.  This doctrine precludes Dodson from relitigating issues of law and fact decided in Dodson I and II so long as she "had a full and fair

opportunity to litigate the issue in question." Bradley Ventures, Inc. v. Farm Bureau Mut. Ins. Co. of Ark., 264 S.W.3d 485, 490 (Ark. 2007).

UAMS maintains that collateral estoppel applies to Dodson I and II, barring both of Dodson's pending claims, but our discussion is considerably narrower. First, I would set aside Dodson I because I am uncertain that the court's relevant finding was "essential to the judgment." Powell, 289 S.W.3d at 444.[9] Second, I would set aside Count II, which is Dodson's implied-contract claim. Importantly, Count II is premised on UAMS's conduct *after* Dodson II, i.e., sending Dodson bills for the embryo storage fees, and therefore cannot be precluded by the earlier chancery court decision. See Ripplin Shoals Land Co. v. U.S. Army Corps of Eng'rs, 440 F.3d 1038, 1044 (8th Cir. 2006) (holding that a prior judgment regarding a permit to modify an existing bridge does not preclude a plaintiff from challenging a decision on a new application describing and a different bridge design); cf. id. at 1042 ("[R]es judicata does not apply to claims that did not exist when the first suit was filed."). Thus, my discussion is limited to the interaction between Dodson II and the pending § 1983 claim, and more specifically, the chancery court's unambiguous findings in Dodson II that, upon dissolution of Dodson and Lay's marriage by court order, Dodson relinquished her right to control the disposition of the embryos and that the IVF Program Director acquired "full authority to decide how to dispose of the embryos."

Dodson argues that the issues of Dodson's rights and of UAMS's authority were not "actually litigated" in Dodson II because the chancery court dismissed her complaint for lack of jurisdiction under the state-law doctrine of sovereign immunity.

---

[9]The Hot Springs County Chancery Court explicitly stated that all control over the embryos transferred to the IVF Program Director upon Dodson and Lay's divorce. Dodson I was an action against Lay, however, and the chancery court could have clarified Dodson's rights relative to Lay without addressing her rights relative to the IVF Program Director. Notably, the chancery court stated it was "not called upon to interpret the third party contract."

I disagree. Under Arkansas law, "only two things" are required for an issue to be "actually litigated." Powell, 289 S.W.3d at 447 (quotation omitted). The test is (1) whether "the issue was effectively raised in the pleadings, or through development of the evidence, and argument at trial or on motion," and (2) whether "the losing party had a full and fair opportunity procedurally, substantively, or evidentially to contest the issue in a prior proceeding." Id. at 446. Nothing indicates that the issue of UAMS's right to control the embryos was not effectively raised or that Dodson lacked a "full and fair opportunity" to contest the issue. Importantly, the chancery court was forced to address the IVF Program Director's authority (or lack thereof) because Dodson raised the issue—she argued that UAMS's actions were arbitrary and *ultra vires*. The parties submitted briefs and exhibits to the court, the court conducted a hearing, and the court evaluated the evidence in the record.

Without any support, Dodson claims that proper jurisdiction is necessary for an issue to be "actually litigated." However, Dodson's argument confuses the "actually litigated" standard with the outcome of a court's inquiry to determine its own jurisdiction. Contrary to Dodson's suggestion, collateral estoppel can bar relitigation of an issue even if the first court's eventual decision is that it lacks jurisdiction to reach the merits. See Gavilan-Cuate v. Yetter, 276 F.3d 418, 420 (8th Cir. 2002) ("Though a jurisdictional determination is not usually binding on future proceedings, it is binding as to issues that are addressed by the Court in determining the jurisdictional question."); see also Durfee v. Duke, 375 U.S. 106, 111 (1963).

Dodson concedes that Dodson II was a "valid and final judgment," and therefore the last question is whether the court's findings about Dodson's rights and UAMS's authority were essential to its judgment in Dodson II. The chancery court first construed Dodson's claim as one for declaratory relief and explained that such a claim is not cognizable under Arkansas law. The court then noted, however, that it was obligated to resolve all doubts in Dodson's favor, and it went on to consider the complaint as a request for permanent injunctive relief. The parties briefed and argued

-20-

the issue of whether UAMS's actions were arbitrary or *ultra vires*, and the court devoted at least eight pages of its opinion to that question. Given this background, and the fact that Dodson was the party pushing the court to address the question of UAMS's authority, I would conclude that the finding about Dodson's relinquishment of authority to the IVF Program Director was essential to judgment in Dodson II. Barring Dodson from relitigating that issue would not offend "the primary purposes of collateral estoppel," which are "to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation." Riverdale Dev. Co., LLC v. Ruffin Bldg. Sys., Inc., 146 S.W.3d 852, 858 (Ark. 2004) (quotation omitted).

As all of the elements of collateral estoppel are satisfied, Dodson II precludes relitigation of whether, upon dissolution of Dodson and Lay's marriage, UAMS acquired full authority to control the disposition of the embryos.[10] That finding forecloses Dodson from establishing a constitutional deprivation based on her alleged right to control the disposition of her embryos. See Davis v. Davis, 842 S.W.2d 588, 604 (Tenn. 1992) (holding that disputes involving the disposition of frozen embryos should be resolved first by looking at progenitors' prior agreement concerning disposition). The bulk of Dodson's § 1983 claim is founded upon that alleged constitutional violation. To the extent she relies on an alleged constitutional right to control the disposition of her embryos, it is clear that no relief can be granted and therefore dismissal was proper pursuant to Rule 12(b)(6).

However, the § 1983 claim has another dimension. Dodson asserts that, by sending her bills for the embryo storage fees for nearly seven years, UAMS

---

[10]Dodson II's findings are conclusive notwithstanding Dodson's interpretation of the Disposition Statement. Dodson suggests that the Disposition Statement is ambiguous, because the term "tissues" does not include embryos. However, this interpretative argument is exactly the type of re-litigation of issues that collateral estoppel is meant to avoid.

recognized Dodson's property interest in the embryos and her constitutional right to decide the disposition of the embryos. I agree that even if <u>Dodson II</u> is conclusive, Dodson alleges a constitutional deprivation, which, like the implied contract claim, goes beyond the scope of <u>Dodson II</u>. Nonetheless, dismissal of Dodson's entire § 1983 claim was proper because relief cannot be granted on the basis of the embryo storage fees. Surely, in some situations, a constitutionally protected property interest can arise out of an implied contract. <u>See</u> <u>Winegar v. Des Moines Indep. Comm. Sch. Dist.</u>, 20 F.3d 895, 899 (8th Cir. 1994). But such an interest cannot arise from a "unilateral expectation," <u>Bd. of Regents of State Coll. v. Roth</u>, 408 U.S. 564, 577 (1972), and the terms of a contract must provide "a legitimate claim of entitlement" to an individual. <u>Meyer v. City of Joplin</u>, 281 F.3d 759, 761 (8th Cir. 2002) (per curiam). Here, Dodson's alleged property interest is based solely on her own expectation from paying the storage fees. There is no allegation that UAMS rescinded or waived its long-held position that the IVF Program Director retained full authority over the embryos. At best, Dodson alleges facts that support an inference of administrative negligence, but not a constitutional entitlement. Dodson cannot use UAMS's apparent billing error to revive the alleged constitutional interest that she relinquished upon her divorce. Such a holding would stretch § 1983 too far. <u>See</u> <u>San Bernardino Physicians' Serv. Med. Group, Inc. v. County of San Bernardino</u>, 825 F.2d 1404, 1408 (9th Cir. 1987) ("It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state into a federal claim."). Thus, even if we distill a version of Dodson's § 1983 claim based on UAMS's conduct after <u>Dodson II</u>, dismissal was proper pursuant to Rule 12(b)(6).

_____